UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

ATLANTIC SPECIALTY INSURANCE       )
COMPANY,                           )
                                   )
        Plaintiff,                 )                No. 6:17-CV-308-REW
                                   )
v.                                 )
                                   )                OPINION AND ORDER
BILL STANLEY, Administrator of the )
Estate of Brandon Stanley, et al., )
                                   )
        Defendants.                )

                         ***  ***  ***  ***

        Atlantic Specialty Insurance Company (ASIC) seeks summary judgment in this

declaratory judgment action. DE #22 (Motion). Bill Stanley opposed.[1] DE #40

(Response).[2] ASIC replied. DE #41 (Reply). The matter is ripe for consideration. For the

following reasons, the Court fully **GRANTS** DE #22 and declares that ASIC has no duty

to defend or indemnify Bobby Joe Smith, in his individual and official capacities,

regarding any insurance form at issue, as to case no. 6:16-CV-264-REW.

---

[1] The Court previously, per particular analysis, set aside the Clerk's entry of default as to
Stanley. *See* DE #45 (Order).

[2] Defendants Bobby Joe Smith and Laurel County Fiscal Court (LCFC) did not respond.
LCFC previously answered the Complaint, *see* DE #16, and the Clerk entered default
against Smith (individually and in his official capacity as Laurel County Constable), *see*
DE #19. Failure to respond is not itself grounds for the Court to grant summary judgment
because summary judgment by default is improper. *See Miller v. Shore Fin. Servs., Inc.*,
141 F. App'x 417, 419 (6th Cir. 2005) (per curiam); *see also Green v. United States*, No.
11-59-HRW, 2013 WL 209019, at *2 (E.D. Ky. Jan. 17, 2013). Upon consideration of
"the motion and supporting materials," the Court can grant summary judgment if
otherwise warranted. Fed. R. Civ. P. 56(e)(3).

# I. BACKGROUND

In this suit, ASIC "seeks a ruling that it is not obligated to defend Smith or to indemnify him from liability arising from the shooting death of [Brandon] Stanley." DE #22, at 5. The relevant facts are straightforward. On March 1, 2016, Brandon[3] fled arrest by Smith, a Laurel County Constable. Three days later, Smith received a tip of Brandon's whereabouts and went to the purported location to investigate. In the course of attempting to arrest Brandon for outstanding warrants, Smith ultimately shot and killed Brandon. Based on the events, a Kentucky jury, in April 2017, convicted Smith of reckless homicide. *See* DE #22-3, at 2; *see generally* DE ##22-1, 22-2 (Newspaper articles). A related civil case pends. *See* case no. 6:16-CV-264-REW (Stanley seeking damages from Smith (and another)[4]). ASIC, in this case, seeks a declaration concerning its coverage obligations, relative to Smith, concerning case no. 16-264.

# II. STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not

---

[3] To avoid confusion, the Court uses "Brandon" to refer to Brandon Stanley, the decedent, and "Stanley" to refer to Bill Stanley, the case defendant and administrator of Brandon's estate.

[4] This suit does not concern ASIC's obligations as to the other named defendant. *See* DE #22, at 4 n.1.

"weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must generally be suitable for admission at trial. *Alexander v. CareSource*, 576 F.3d 551, 557-59 (6th Cir. 2009).[5]

## III.    ANALYSIS

The parties agree that three "coverage forms" define the insurance parameters at issue: (1) the Law Enforcement Liability Coverage Form ("LEL form"), *see* DE #5-1, (2) the Public Officials Errors and Omissions Coverage Form ("E&O form"), *see* DE #5-3, and (3) the Commercial General Liability Coverage Form ("GL form"), *see* DE #5-2.[6] The Court considers each, accounting for the parties' arguments, in turn.[7]

---

[5] That this case is a declaratory judgment action does not alter the generally applicable summary judgment standard or analytical framework. *See, e.g.*, *Bituminous Cas. Corp. v. J & L Lumber Co., Inc.*, 373 F.3d 807, 812 (6th Cir. 2004); *Secura Ins. Co. v. Gray Constr., Inc.*, 717 F. Supp. 2d 710, 713-14 (W.D. Ky. 2010); *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 298 F.3d 201, 210 & n.12 (3d Cir. 2002) ("The standard for granting summary judgment on a request for a declaratory judgment is the same as for any other type of relief.").

[6]      The Court notes that the tendered forms are partial documents and do not contain signatures. *See* DE ##5-1, 5-2, and 5-3. The parties, further, did not attach the Declarations, identifying the Named Insured. That said, the parties do not dispute that the forms are the operative coverage-defining documents, and Stanley does not dispute ASIC's representation that the "Laurel County Fiscal Court maintained a policy of

A.    *Legal Principles*

"[T]he proper interpretation of insurance contracts generally is a matter of law to be decided by a court[.]" *Thiele v. Ky. Growers Ins. Co.*, 522 S.W.3d 198, 199 (Ky. 2017).[8] The analysis "begins with the text of the policy itself." *Pryor v. Colony Ins.*, 414 S.W.3d 424, 430 (Ky. Ct. App. 2013). The Kentucky Supreme Court has "consistently held that the words employed in insurance policies, if clear and unambiguous, should be given their plain and ordinary meaning." *Thiele*, 522 S.W.3d at 200 (internal quotation marks and alteration removed). "Where the terms of an insurance policy are clear and unambiguous, the policy will be enforced as written." *Kemper Nat'l Ins. Cos. v. Heaven Hill Distilleries, Inc.*, 82 S.W.3d 869, 873 (Ky. 2002). The Court "must give effect to what the parties expressly agreed upon[.]" *Nationwide Mut. Ins. Co. v. Nolan*, 10 S.W.3d 129, 131 (Ky. 1999).

However, "when interpreting insurance policies, the contract should be liberally construed and any doubts as to coverage should be resolved in favor of the insured." *MGA Ins. Co., Inc. v. Glass*, 131 S.W.3d 775, 778 (Ky. Ct. App. 2004) (internal quotation marks and alteration removed). "Where an exclusion is susceptible to two

---

insurance through ASIC" that "had several forms, including" the three at issue. *See* DE #22, at 5.

    The Court also notes, at the outset, especially regarding the GL form issues, the relatively limited scope of proof submitted vis-à-vis the Rule 56 effort. The Court has not seen, to name but a few examples, Smith's full deposition, any evidence or actual filings from the underlying criminal trial, or the A&B video.

[7] "[A]ny court of the United States," 28 U.S.C. § 2201(a) provides, "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." Such a declaration is the exclusive relief ASIC seeks.

[8] The parties agree that substantive Kentucky law applies in this diversity case; the Court, accordingly, undertakes no independent choice-of-law analysis. *Gahafer v. Ford Motor Co.*, 328 F.3d 859, 861 (6th Cir. 2003).

reasonable interpretations, the interpretation favorable to the insured is adopted." *St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc.*, 870 S.W.2d 223, 226 (Ky. 1994). But, a "liberal interpretation is not synonymous with a strained one." *K.M.R. v. Foremost Ins. Grp.*, 171 S.W.3d 751, 753 (Ky. Ct. App. 2005). "The rule of strict construction against an insurance company," thus, "does not mean that every doubt must be resolved against it and does not interfere with the rule that the policy must receive a reasonable interpretation consistent with the parties' object and intent or narrowly expressed in the plain meaning and/or language of the contract." *St. Paul Fire*, 870 S.W.2d at 226. Indeed—importantly—the parties' intent "is to be deduced, if possible, from the language of the contract alone." *Nolan*, 10 S.W.3d at 131-32; *K.M.R.*, 171 S.W.3d at 753 (same); *Ky. Unemployment Ins. Comm'n v. Wilson*, 528 S.W.3d 336, 340 (Ky. 2017) (same principle).

Exclusions "do not grant coverage; rather, they subtract from it." *Kemper Nat'l Ins. Cos.*, 82 S.W.3d at 872; *see also id.* at 871 (describing the "function" of "exclusions" to be "to restrict and shape the coverage otherwise afforded" in the policy). "Because coverage exclusions are contrary to the fundamental protective purpose of insurance, they are strictly construed against the insurer and will not be extended beyond their clear and unequivocal meaning. But that strict construction should not overcome plain, clear language resulting in a strained or forced construction." *Id.* at 873-74 (internal quotation marks removed). "[A] clearly worded exclusion is not treated as ambiguous," and "[t]ortured constructions of clauses in an attempt to create an aura of ambiguity are unavailing to create coverage." *Holzknecht v. Ky. Farm Bureau Mut. Ins. Co.*, 320 S.W.3d 115, 121-22 (Ky. Ct. App. 2010); *see also, e.g.*, *Transamerica Ins. Co. v. Duro*

*Bag Mfg. Co.*, 50 F.3d 370, 372-73 (6th Cir. 1995); *Am. Nat'l Bank & Trust Co. v. Hartford Accident & Indem. Co.*, 442 F.2d 995, 999-1000 (6th Cir. 1971); *Owners Ins. Co. v. Frontier Housing, Inc.*, 291 F. Supp. 3d 810, 815 (E.D. Ky. 2017).

B.     LEL Form

The LEL form plainly excludes (in a section titled "**EXCLUSIONS**") from coverage ("This insurance does not apply to") "[a]ny 'claim' arising directly or indirectly out of, or in any way related to a . . . criminal act, or the willful violation of any statute, ordinance or regulation committed by or with the knowledge of the insured." DE #5-1, at 3 (Section III.4). "However," ASIC did commit to "defend[ing] the insured for a 'suit' . . . until either a judgment or final adjudication established such an act or the insured confirms such an act." *Id.*[9]

The Court holds that the criminal act exclusion, in this situation and on this record, is clear and unambiguous. *See Kemper Nat'l Ins. Cos.*, 82 S.W.3d at 873-74. Accordingly, the Court "give[s] effect to what the parties expressly agreed upon," *Nolan*, 10 S.W.3d at 131, and deduces the parties' intent "from the language of the contract alone." *Id.* at 131-32. The Court, thus, enforces the contract "as written." *Kemper Nat'l*

---

[9]     The parties make no argument concerning the definitions of "claim" and "suit." Those are not at issue in the case. Neither is the separate "malicious prosecution" exclusion carveout.

Additionally, the Court assumes (without deciding), for purposes of processing the LEL claims, that Smith in both his individual and official capacities is validly an insured, per Section IV.1, and that he (accused of wrong while endeavoring to arrest Brandon) committed a "law enforcement wrongful act," per Sections I.A.1, VII.7, and VII.8. The Court notes that it would be difficult to construe the act of attempting to effectuate arrest, by a duly elected Laurel County official, as not falling within the coverages and definitions of the LEL policies (and indeed, the other policies). This is particularly so given Smith's elected status and given Kentucky's generally expansive view of employment scope. *See, e.g.*, *Patterson v. Blair*, 172 S.W.3d 361, 369-72 (Ky. 2005); *Frederick v. Collins*, 378 S.W.2d 617, 618-20 (Ky. 1964). The Court saves any plenary review for another day due to the clarity of the exclusion in this case.

*Ins. Cos.*, 82 S.W.3d at 873-74 (holding the exclusion at issue was "unambiguous" because it "clearly defines the coverage").

Stanley's claims in 16-264 unquestionably fall under the umbrella of the criminal act exclusion—*i.e.*, they arise directly or indirectly out of, or in some way relate to, a criminal act committed by Smith (reckless homicide). *See* DE ##5-4 (Amended 16-264 Complaint); 22-3, at 2. "Reckless homicide is a Class D felony." KRS 507.050(2). Further, the criminal judgment against Smith, entered in April 2017, established the criminal act before the filing of the operative 16-264 Complaint, on May 30, 2017, and before Smith answered, in December 2017. This means that Section III.4's "however" clause is satisfied—*i.e.*, a judgment established the criminal act, and ASIC had no prospective duty to defend.

In the briefing, Stanley argues, at length, that the criminal act exclusion is ambiguous or otherwise unenforceable. *See* DE #40, at 10-18. The Court rejects each theory. First, Stanley complains that, via the criminal act exclusion, "the Insurer giveth on one hand and taketh away on the other." *Id.* at 10-11. Indeed, that is the point of exclusions—to remove coverage. *See Kemper Nat'l Ins. Cos.*, 82 S.W.3d at 872. A broad coverage grant, tempered and shaped by a specific exclusion, does not, perforce, an ambiguity make. *See id.* at 873-76; DE #5-1, at 1 (including a "to which this insurance applies" caveat in Section 1.A.1); *id.* at 2 (**EXCLUSIONS**: "This insurance does not apply to . . .").

The Court, further, sees no need to engage Stanley's hypothetical quartet. *See id.* at 11-13. The facts of *this case* govern the analysis; the question is not whether ambiguity could theoretically exist on *other* facts. *See, e.g., Auto Club Pro.-Cas. Ins. Co. v. B.T. ex*

*rel. Thomas*, 596 F. App'x 409, 413 (6th Cir. 2015) (contemplating that a criminal act exclusion may be "ambiguous when applied to particular acts that were not quintessentially criminal," such as "drag racing" and "possessing and igniting fireworks without a license"); *True v. Raines*, 99 S.W.3d 439, 443 (Ky. 2003) (rebuffing parties' "attempts to muddy the waters and create some question of interpretation" so as to manufacture ambiguity (internal alteration removed)); *Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc.*, 409 F.3d 342, 349 (6th Cir. 2005).

Further, the Court rejects Stanley's effort to find uncertainty in the meaning of "criminal act" itself. *See id.* at 13-15. The lines to be drawn hinge on the case to be decided. Whatever the outer contours of that phrase may be, it unquestionably applies to situations, such as this one, where a jury previously convicted the (assumed) insured of a crime—indeed, a homicide-related felony, *see also* KRS 500.080(2) (defining "crime" to mean, *inter alia*, "a felony"). *See, e.g.*, *Employers Ins. of Wausau v. Martinez*, 54 S.W.3d 142, 144-45 (Ky. 2001).

Next, Stanley spends two-and-a-half pages of his brief discussing a 32-year-old North Carolina Court of Appeals case. *See* DE #40, at 15-17 (analyzing *Graham v. James F. Jackson Assocs., Inc.*, 352 S.E.2d 878 (N.C. Ct. App. 1986)). *Graham* (apart from, of course, being nonbinding) is readily distinguishable from this case, as Stanley himself acknowledges. *See* DE #40, at 17 (conceding that "the language of the policy in Graham is not exactly as the Atlantic Specialty policy language herein" (no italics in original)). In *Graham*, the policy "expressly provide[d] coverage for negligently inflicted bodily injury resulting in death, but . . . exclude[d] from coverage 'criminal acts,' which, in the case of involuntary manslaughter, could include negligently inflicted bodily injury resulting in

death. Thus, the policy [wa]s reasonably susceptible to more than one construction and must be construed in favor of providing coverage." 352 S.E.2d at 431.

This is wholly distinct from the LEL form. As an initial matter, reckless homicide requires a different mens rea (recklessness, as the name suggests) from gross or ordinary negligence. *See, e.g.*, *Stephens v. Commonwealth*, 356 S.W.2d 586, 587 (Ky. 1962) (describing a sliding scale, in the unintentional homicide context, from greater to lesser culpability—starting with recklessness, moving to gross negligence, and ending with ordinary negligence); *Bentley v. Commonwealth*, 354 S.W.2d 495, 496 (Ky. 1962) ("'Gross negligence' has been recognized as less culpable than 'reckless and wanton' conduct."). Further, even if recklessness is equivalent to gross negligence, as some courts hold, *see, e.g.*, *Solow v. Heard McElroy & Vestal, LLP*, 7 So.3d 1269, 1277 (La. Ct. App. 2009), Stanley cites no LEL form provision "expressly" providing coverage for "negligently inflicted bodily injury" or a "negligent act" (or, for that matter, "recklessly inflicted bodily injury" or a "reckless act").[10] The general "breach of duty" provision within the "law enforcement wrongful act" definition is the closest parallel. DE #5-1, at § VII.8. The absence of such an express coverage-granting provision distinguishes *Graham* and precludes direct conflict with the criminal act exclusion. The Court finds *Graham* to be inapplicable and unpersuasive, in this factual scenario.

---

[10] Stanley's theory is that the coverage grant would, by virtue of its breadth, blanket negligent acts, while the criminal act exclusion could, on particular facts, cover a crime with a negligence mens rea, leading to conflict and, thus, a pro-coverage ruling. The same could be said for reckless and even intentional mentes reae. The key—and what makes the analysis here easy—is that there is no express coverage-granting (and thus exclusion-conflicting) clause, as in *Graham*. That there is no *specific exclusion* for negligent acts or negligently inflicted bodily injury (or the equivalents for other mental states), *see* DE #40, at 14-15, does not logically impact application of the criminal act exclusion, whatever the mens rea for the crime at issue. Again, subtracting coverage from an otherwise broad grant is an exclusion's raison d'être.

10

Finally, "[u]nder the doctrine of reasonable expectations," which Stanley invokes, *see* DE #40, at 18-19, "an insured is entitled to all the coverage he may reasonably expect to be provided *according to the terms of the policy*." *Ky Ass'n of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 634 (Ky. 2005) (internal quotation marks removed; emphasis in original); *see also, e.g.*, *Acuity, A Mut. Ins. Co. v. Servs. Constr., LLC*, No. 5:15-CV-107-REW, 2017 WL 2543307, at *5-7 (E.D. Ky. June 12, 2017) (thoroughly explaining the contours of Kentucky's doctrine of reasonable expectations). The exclusion here, as the Court discusses in this Opinion, was "unequivocally conspicuous, plain and clear." *McClendon*, 157 S.W.3d at 634. Even if "Kentucky law envisions that the particulars of a given situation could inject ambiguity into terms nominally clear," *Acuity*, 2017 WL 2543307, at *7, Stanley establishes, in the Court's opinion, no reasonable expectation of coverage, in light of the record and the contract language actually agreed to. *See, e.g.*, *Healthwise of Ky., Ltd. v. Anglin*, 956 S.W.2d 213, 216-17 (Ky. 1997); *Am. Family Life Assur. Co. v. Bilyeu*, 921 F.2d 87, 89 (6th Cir. 1990).

"[A]ny applicable exclusion is sufficient to remove coverage," and the ASIC criminal act exclusion "clearly defines the coverage" here. *Kemper Nat'l Ins. Cos.*, 82 S.W.3d at 874. "Consequently, the literal language of the exclusion must apply to preclude coverage in this case." *Holzknecht*, 320 S.W.3d at 120. The exclusion was "plainly and unequivocally presented in the four corners of the policy," and the Court accordingly enforces it. *Phil. Indem. Ins. Co., Inc. v. Tryon*, 502 S.W.3d 585, 593 (Ky. 2016) (finding an exclusion "unambiguous" when "the text" was "quite clear" concerning

what the parties "intend[ed] to exclude [from] coverage");[11] *State Auto. Mut. Ins. Co. v. Sec. Taxicab, Inc.*, 144 F. App'x 513, 517-20 (6th Cir. 2005) (enforcing analogous criminal act exclusion); *Ritchie v. Turner*, 547 S.W.3d 145, 148-49 (Ky. Ct. App. 2018) (same); *Auto Club Prop.-Cas. Ins. Co. v. Adler*, No. 1:14-CV-46-JHM, 2015 WL 4934200, at *5 (W.D. Ky. Aug. 18, 2015) (same).[12] Smith committed reckless homicide, a felony, in the deadly encounter with Brandon. The ASIC policy excludes coverage for claims arising from or related to that criminal act.

C.      GL Form

The at-issue GL form exclusion is in Section I.2.a, titled "Expected Or Intended Injury Or Damage," under the heading, "**Exclusions**." DE #5-2, at 2.[13] There, the contract provides that the "insurance does not apply to . . . 'Bodily injury' . . . expected or intended from the standpoint of the insured." *Id.* However, the exclusion "does not apply to 'bodily injury' . . . resulting from the use of reasonable force to protect persons or property." *Id.*

The parties do not dispute the "bodily injury" element; indeed, Smith (twice) shot Brandon, and Brandon died. *See* DE #5-2, at 19 (defining "bodily injury" to include

---

[11] The relevant portions of the E&O form are essentially identical. *See, e.g.*, DE #5-3, at 1 (Section I.A.1), 4 (Section III.5), 7 (Section IV.1), 11 (Section VII.12), and 13 (Section VII.29). The parties treat the issues and provisions as coterminous, *see* DE ##22, at 11-13; 40, at 21; 41, at 7, and the Court follows suit. For the same reasons that the LEL form does not impose an obligation on ASIC to defend Smith (both individually and in his official capacity), as to case 16-264, neither does the E&O form.

[12] Stanley's abbreviated effort to distinguish *Security Taxicab* and *Adler*, *see* DE #40, at 18, is unconvincing. To be sure, neither case involved a reckless homicide felony. The Court fails to see, on these facts at least, how a variant mens rea impacts application of the criminal act exclusion, which demands no particular mental state.

[13] As above, *see infra* n.9, the Court assumes (without deciding), for purposes of processing this claim, that Smith, in both his individual and official capacities, is validly an insured.

"death resulting from" physical harm). Was, however, bodily injury, a term that includes mere "physical harm," *see id.*, "expected or intended from the standpoint of [Smith?]" On this record, the only reasonable answer is yes.

Start with the second sentence of Section I.2.a: "This exclusion does not apply to 'bodily injury' . . . resulting from the use of reasonable force to protect persons or property." Twelve Kentuckians convicted Smith of reckless homicide. "A person is guilty of reckless homicide" in Kentucky "when, with recklessness he causes the death of another person." KRS 507.050(1). A

> person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

KRS 501.020(4). Thus, put a bit more simply, "recklessness is the failure to perceive a risk that a reasonable person in the same situation would have perceived." *Robertson v. Commonwealth*, 82 S.W.3d 832, 835 (Ky. 2002). Here, Smith testified that he intentionally (though he claimed justifiably) shot Brandon twice during the altercation. *See, e.g.*, DE #22-1, at 5.

Stanley's brief, on this point, essentially tries to distinguish between Smith's *act* and his state of mind regarding *the result of* the act. Stanley contends that the jury determined that Smith acted recklessly as to the risk that his actions posed to Brandon, *not* that Smith used an unreasonable amount of force. *See* DE #40, at 20-21. This is strong lawyering and is, looking at the conviction in isolation, correct. One problem is, however, that Stanley, in a pleading, previously took an inconsistent position. *See* DE #15 (Amended Complaint), case no. 6:16-cv-264-REW, at ¶ 26 (disparaging Smith for

using force against Brandon than Smith "could not have reasonably believed . . . was reasonable").

A bigger problem for Stanley is that, in Kentucky, self-protection is, as a general matter, a defense to reckless homicide. *See, e.g.*, *Elliott v. Commonwealth*, 976 S.W.2d 416, 422 (Ky. 1998); *Commonwealth v. Hager*, 41 S.W.3d 828, 837-38 (Ky. 2001); *Estep v. Commonwealth*, 64 S.W.3d 805, 808, 810-11 (Ky. 2002); *Hatcher v. Commonwealth*, 310 S.W.3d 691, 700 (Ky. Ct. App. 2010); KRS 503.085(1) (providing that one who validly uses force in self-protection "is immune from criminal prosecution"). The defense of self-protection, in turn, probes (as relevant here) whether the force user "was privileged to use such physical force . . . as he believed to be necessary in order to protect himself[.]" *Estep*, 64 S.W.3d at 808; *see also id.* at 811 (confirming that this instruction "accurately described the nature of the defense of self-protection"); KRS 503.050(1). The parties do not dispute that self-protection was Smith's trial defense. *See* DE ##22, at 4 (ASIC: "Smith claimed [Brandon] posed a threat to him[.]"); 40, at 14 (Stanley: "During the criminal trial [Smith] maintained his innocence and maintained that he shot [Brandon] in self-defense."); 41, at 7.

One portion of Kentucky self-protection matches well the I.2.a second sentence: the requirement that the use of force be "to protect persons," a category that would, logically, including oneself.[14] The second portion, however, is a less perfect match: self-

---

[14] Stanley makes no argument concerning the word "persons" being plural. It is more favorable to Stanley to interpret "persons" to include a singular person; such an interpretation broadens the exception to the exclusion. Further, otherwise, the exception to the exclusion could *never* apply in a pure self-protection scenario, contrary to ASIC's (implied) position in the briefing. *See* DE #41, at 7. Regardless, the record indicates that Smith claimed he perceived a need to protect not only himself, but also "everyone else in this store," indicating the involvement of multiple persons. DE #22-1, at 5.

protection contemplates "necessary" force, while the I.2.a second sentence contemplates "reasonable" force. The Court rejects the notion that there may be relevant daylight, at least on these facts, between "necessary" and "reasonable." *See, e.g.*, *Commonwealth v. Hasch*, 421 S.W.3d 349, 363 (Ky. 2013) (holding, in a particular scenario, that parties "may not encourage the jury to draw the inference that . . . the defendant's use of force in self-defense was not reasonably necessary"); *Haugh v. City of Louisville*, 242 S.W.3d 683, 687 (Ky. Ct. App. 2007) (affirming summary judgment when police used "only the reasonable force necessary to effectuate the arrest"); *Charles v. Commonwealth*, 634 S.W.2d 407, 409 (Ky. 1982) (phrasing self-protection test using "reasonable force").

A fact-finder could not reasonably conclude that, although Smith shooting Brandon was not necessary (as was one determination[15] that could have required the Kentucky criminal jury to reject the self-protection defense),[16] the shooting was,

---

[15] The other possible determination is that the force by Smith was necessary, but was not used in order to protect himself. If that was, in fact, the jury's finding, the I.2.a second sentence would still not preclude exclusion operation. Stanley makes no argument that the second sentence could have independent meaning vis-à-vis the third-parties present in A&B and, thus, has forfeited that potential theory. *Guyan Int'l, Inc. v. Prof. Benefits Adm'rs, Inc.*, 689 F.3d 793, 799 (6th Cir. 2012); *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (deeming "waived" even issues "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation"). It is telling, too, that there is no suggestion that Smith raised a defense-of-others argument at trial. *See* KRS 503.070(1). Surely, if these facts (where Brandon, allegedly with eyes bulging from perceived meth use, was acting erratically, advancing on Smith, reaching into his pockets, and transferring an item between hands) failed to support self-protection, a like result would attend a defense-of-others theory. The record does not reveal any particular threat Brandon made toward a third party at A&B. The parties, further, do not suggest relevance or involvement of an imperfect self-protection theory, or that the criminal jury found that Smith wantonly or recklessly held a self-protection belief. *See, e.g.*, *Hasch*, 421 S.W.3d at 355-56; *Hager*, 41 S.W.3d at 844.

[16] *See Estep*, 64 S.W.3d at 811 (holding that "the absence of the privilege to act in self-protection [i]s an element of the offense of reckless homicide" and that a jury may convict only if it "believed from the evidence beyond a reasonable doubt that" the defense of self-protection does *not* apply); *Hager*, 41 S.W.3d at 833 n.1 ("Once evidence

nevertheless, a "use of reasonable force." *See also Med. Protective Co. v. Duma*, 478 F. App'x 977, 982 (6th Cir. 2012). An unnecessary constabulary use of force is one inherently unreasonable. The terms are inextricably intertwined in relevant law. *See, e.g.*, *Hasch*, 421 S.W.3d at 361 (contemplating degrees of authorized force, in context: "Thus, in considering whether a defendant who was under attack reasonably believed that force was 'necessary,' we look at the nature of the attack he faced and consider what force, if any, was necessary to ward it off."); *id.* at 363 (asking whether "the defendant's use of force in self-defense was . . . reasonably necessary").[17] The second sentence of Section I.2.a, thus, does not preclude operation of the exclusion.

Return to the primary sentence: "This insurance does not apply to . . . '[b]odily injury' . . . expected or intended from the standpoint of the insured." This record—as relatively unweighted by proof as it is—establishes but one reasonable conclusion: that Smith expected or intended bodily injury to Brandon.

The most direct, relevant proof that the parties tendered regarding the Rule 56 effort is a London *Sentinel Echo* newspaper article. *See* DE #22-1.[18] The article reports

---

is introduced which justifies an instruction on self-protection or any other justification defined in KRS chapter 503, the Commonwealth has the burden to disprove it beyond a reasonable doubt, and its absence becomes an element of the offense.").

[17] "Necessary" does not mean "absolutely required." Rather, the word evidences a more flexible concept—an "individual facing a threat of injury or death," for instance, need not "exhaust all other alternatives before his use of force in self-defense can be found to be 'necessary.'" *Hasch*, 421 S.W.3d at 361; *cf. M'Culloch v. Maryland*, 17 U.S. 316, 324-25 (1819). Rules in this milieu should not "confound Aristotle," and, on these facts, failing to recognize a confluence of necessary and reasonable force use would suggest lauding the "metaphysically appealing" over resulting "unwieldy and confusing" practical implications. *See Hasch*, 421 S.W.3d at 362-63.

[18] "A newspaper article is considered hearsay, and the general rule is that it is not admissible to prove the facts stated therein." *Barbo v. Kroger Co.*, No. 3:07-CV-14-S, 2007 WL 2350183, at *2 (W.D. Ky. Aug. 13, 2007); *but see Gowens v. Tidwell*, No. 10-

content of Smith's trial testimony, directly revealing his state of mind during the shooting:

> Smith testified on his own behalf, stating he was afraid for his own life when he shot Stanley. He confronted Stanley in the game room of A&B Market and ordered Stanley to put his hands up. Instead, Stanley started walking toward Smith, with Smith backing out of the game room and into the main part of the store.
>
> Smith said Stanley kept reaching into his pockets - where Smith already knew he carried a razor knife from the traffic stop three days earlier. Stanley also never opened his hands completely and he pointed out on the surveillance tape provided by A&B Market that Stanley reached across his head and transferred something from one hand to another.
>
> "I was backed up as far as I could go and I was starting to get scared," Smith said. "He had something in his hands, his eyes were big like someone on meth, he was real bouncy and had erratic actions," Smith said. "I had to do what I had to do."
>
> Cessna asked Smith if he repeatedly asked Stanley to get down on the floor.

---

10518, 2013 WL 2285446, at *4 (E.D. Mich. May 23, 2013) (discussing possible scenarios where a newspaper article could be admitted).

Normally, "hearsay evidence cannot be considered on a motion for summary judgment." *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994). However, where, as here, a party "fails to object . . . to the . . . evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived," and the Court properly considers the tendered proof. *Id.*; *see also, e.g.*, *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 613 n.3 (6th Cir. 2007) ("None of Powers's evidence satisfies the standards of Federal Rule of Civil Procedure 56 for evidence submitted in support of summary judgment. . . . Despite these glaring deficiencies, we may still consider Powers's evidence because the Public Defender did not object to its competence below (or on appeal, for that matter)."); *Moore v. Holbrook*, 2 F.3d 697, 699 (6th Cir. 1993) ("Although the documents do not satisfy the requirements of Rule 56(e), the argument, nonetheless, does not justify reversal of the district court's judgment. Moore failed to object to the documents inclusion in defendants' motion for summary judgment. Because Moore did not raise the issue before the district court, it is not reviewable on appeal."); *Dobrowiak v. Convenient Family Dentistry, Inc.*, 315 F. App'x 580, 584-85 (6th Cir. 2009). Cases contemplate a "gross miscarriage of justice" exception to this waiver rule, *see Wiley*, 20 F.3d at 226, but the Court perceives (and Stanley identifies) no basis for that to apply here. Stanley does not dispute the relevant parts of the version relied on by ASIC. *See* DE #40, at 1-2.

"I wasn't asking, I was begging," Smith replied. "He put his hands down in fight stance and said he was leaving (the store), dead or alive. I didn't think he was talking about him. I was thinking he was talking about me."

Smith said he saw the glint of silver in Stanley's hands and knew he had to take action. "I was afraid for my life. He was 10 feet or less from me," Smith said. "I kept thinking, All he's got to do is get my weapon and he can kill me and everybody else in this store. He can react faster than I can act."

After firing the first shot, Stanley fell on the floor but rose back up again. That's when Smith said he fired the second shot.

"I had to get the threat over," he said. "If I didn't do it, I would not be here today."

*Id.* at 5.

This is a report of proof from a person who intentionally shot Brandon, and who expected and intended to cause bodily injury to Brandon. Smith was "afraid for his own life," and Brandon "was starting" to scare him. Smith knew that he "had to do what [he] had to do," and "knew he had to take action," not only to protect his own life,[19] but the lives of "everybody else in th[e] store." *See also* DE #40, at 8 (Stanley agreeing that Smith "felt as if he had to shoot [Brandon] to protect his [Smith's] life"). Smith perceived a need to "get the threat over." Smith ultimately shot Brandon *twice*—the second time, after Brandon "rose back up" from the impact of the first round. This was not some accidental or unintended incident.

Further, the proof from Dr. William Ralston, according to the *Sentinel Echo*, indicated two shots to Brandon's torso—one that "entered the left chest area near the third rib, . . . then traveled through the aorta, the heart, the right lung and was recovered

---

[19] *See also Coleman v. State Farm Fire & Cas.*, No. 2015-CA-350-MR, 2016 WL 4256903, at *2 (Ky. Ct. App. Aug. 12, 2016) (declining to "creat[e] a self-defense exception to the intentional-act exclusion").

from the right back area," and a second that "entered from the right back area, traveling through the ribs, liver, lung, and heart before lodging near the left arm pit." DE #22-1, at 3-4. Other trial proof apparently indicated that "there was no malfunction with the gun," which was "in good working condition with no problems with the trigger pull or safety." *Id.* at 4. One witness even reported that Smith warned Brandon, "Please don't make me hurt you." *Id.* at 5.[20] Smith knew what he was doing, and intentionally shot Brandon expecting and intending to harm him.

"Whether an insured intended the consequences of [his] action is normally a question of fact and not one of law. The determination of whether an insured expected or intended the damage resulting in the claim is for the jury. . . . Determination of intent is normally inappropriate for summary judgment." *James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 276 (Ky. 1991); *see also id.* at 278-79 ("The 'expected or intended' exception is inapplicable unless the insured specifically and subjectively intends the injury giving rise to the claim."). However, summary judgment "can be proper on any issue including state of mind questions such as intent and expectation. Generally when . . . controlling facts are not in dispute, summary judgment can be proper." *Id.* at 276-77.

---

[20] The Court has, additionally, reviewed every word of the selective deposition excerpts Stanley provided in response. *See* DE #40-1. The Court finds the disjointed excerpts to be mostly unhelpful. If anything, they confirm the generally intentional nature of Smith's actions toward Brandon during the relevant encounter, and basically corroborate the newspaper's recount. *See, e.g.*, *id.* at 5 (Depo. p. 99) ("Q: And you had your weapon pointed at Mr. Stanley; is that correct? A: Yes."); *id.* at 7 (Depo. p. 106) ("I'm telling him to get on the ground, show me his hands, over and over. He – as he's coming towards me, he raises his hands above his head. I see him . . . kind of switch something from one hand to the other.").

That is the case here: this is a scenario where summary judgment, even as to Smith's state of mind, is proper. Smith's testimony—using phrases like "I had to do what I had to do" and saying he "knew he had to take action"—strongly imply an intent to physically harm. "I had to get the threat over," Smith said, indicating specific intent and the expectation to neutralize, via firearm discharge, the threat he perceived Brandon to pose. Smith acted, he said, with the goal in mind of protecting his own life, as well as the lives of those in the store. The only reasonable interpretation of these comments is that Smith expected and intended to physically harm Brandon when he shot him—Smith wanted to incapacitate Brandon.[21] The second shot as Brandon tried to rise up from the ground, as well as the mid-body (torso) location of both slugs and the third-party testimony concerning Smith orally contemplating "hurt[ing]" Brandon, strongly corroborates the expectation and intent Smith's testimony expressed. Smith unquestionably, on this record, intentionally shot and expected to harm Brandon.

That the jury convicted of reckless homicide does not change, indeed it reinforces, this conclusion. The verdict indicates that Smith failed to perceive a substantial and unjustifiable risk *of death*; it does not address Smith's expectation or intent regarding mere *physical harm*. *See Hasch*, 421 S.W.3d at 355-56; *Elliott*, 976 S.W.2d at 419, 422; KRS 507.050(1) ("A person is guilty of reckless homicide when, with recklessness he

---

[21] Stanley cites no proof in support of his argument that "Smith has vehemently denied that . . . he had any intention to harm [Brandon.]" DE #40, at 20. This is a deficient strategy to contest a Rule 56 motion. *See Anderson*, 106 S. Ct. at 2514 (stating that the opposing party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment."); *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004) (same principle); *Wimbush v. Wyeth*, 619 F.3d 632, 638 n.4 (6th Cir. 2010). "The record," contrary to Stanley's argument, as the Court has catalogued, is not "devoid of any factual indication to suggest otherwise." DE #40, at 20. Per Stanley, "[H]e [Smith] contends he discharged his service pistol to protect his own life[.]" *Id.* at 2.

causes the death of another person.") & 501.020(4) (contemplating that one acts "recklessly with respect to *a result . . . described by a statute defining an offense* when he fails to perceive a substantial and unjustifiable risk that *the result* will occur" (emphases added)); *Mitchell v. State*, 321 S.W.3d 30, 40 (Tex. App. 2010). The other record proof (such as it is) one-sidedly supports a finding of expectation and intent to cause *harm*, even if summary judgment would be improper concerning an expectation or intent to cause *death*. A person could deliberately shoot someone with the intent merely to harm, not kill. *See, e.g.*, *State v. Madden*, 294 A.2d 609, 613, 615-16, 619 (N.J. 1972); *State v. Muzzy*, 262 N.W. 335, 335 (N.D. 1935); *Bard v. State*, 214 P. 939, 941 (Okla. Crim. App. 1923).

Additionally, and independently, Smith committed an "inherently injurious" act in deliberately twice shooting Brandon, similar to prior analytical examples of throwing "an intentional punch in the face," *see Walker v. Econ. Preferred Ins. Co.*, 909 S.W.2d 343, 345 (Ky. Ct. App. 1995), or "an intentional act" of "sexual molestation," *see Thompson v. W. Am. Ins. Co.*, 839 S.W.2d 579, 581 (Ky. Ct. App. 1992). This "inferred intent rule" recognizes that "in certain circumstances one may reasonably infer from the facts that the actor intended the harm, without needing to resort to proof of that intent." *Nationwide Mut. Fire Ins. Co. v. Pelgen*, 241 S.W.3d 814, 817 (Ky. Ct. App. 2007). Kentucky courts apply this rule to intentional firearm discharge scenarios. *See, e.g.*, *id.* at 818; *Ky. Farm Bureau Mut. Ins. Co. v. Coyle*, 285 S.W.3d 299, 306 (Ky. Ct. App. 2008); *Stone v. Ky. Farm Bureau Mut. Ins. Co.*, 34 S.W.3d 809, 812-13 (Ky. Ct. App. 2000); *Coleman*, 2016 WL 4256903, at *2-3. As Judge Atkins summarized, after surveying the cases, "When the facts are clear that a shooting is intentional, a court may infer intent to harm."

*Nationwide Mut. Fire Ins. Co. v. James*, No. 09-40-EBA, 2011 WL 382221, at \*4-5 (E.D. Ky. Feb. 3, 2011).[22] Based on the proof indicating an intentional shooting, the Court infers an expectation and intent to harm, on these facts.

The record and law here, thus, "compel only one reasonable inference" regarding Smith's mindset during the shooting: that he expected and intended bodily harm to Brandon. *See Brown Found.*, 814 S.W.2d at 277. This conclusion means that the Section I.2.a exclusion applies and "preclude[s] coverage in this case." *Holzknecht*, 320 S.W.3d at 120; *Brown Found.*, 814 S.W.2d at 278-81 (contemplating that such an exclusion can be enforceable); *Grange Mut. Cas. Co. v. Ross*, 125 F.3d 855, No. 96-5355, 1997 WL 640018, at \*1 (6th Cir. Oct. 14, 1997) (table) (affirming Judge Wilhoit's decision applying such an exclusion); *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 507-10 (6th Cir. 2003). The conviction precludes the exclusionary exception in sentence two of § I.2.a. The exclusion was "plainly and unequivocally presented in the four corners of the policy," and the Court accordingly enforces it. *Tryon*, 502 S.W.3d at 593.[23]

---

[22] The Court, thus, disagrees with the categorical nature of ASIC's arguments that when "an insured shoots someone, he necessarily expects or intends to cause them [sic] bodily injury," DE #22, at 10, and that it "is axiomatic that one who shoots another with a firearm expects or intends to cause that person bodily injury," DE #41, at 6. The Court finds a qualifier required: when an insured *intentionally* shoots someone, he necessarily expects or intends to cause bodily injury, and one who *intentionally* shoots another with a firearm expects or intends to cause that person bodily injury. *See, e.g.*, *James*, 2011 WL 382221, at \*5 (declining to infer intent to harm on the facts, involving a minor discharging a rifle and killing one of his friends in his bedroom, as well as debate concerning whether the minor touched the trigger or merely thumbed the safety); *Pelgen*, 241 S.W.3d at 817 (reasoning that only where "the insured's conduct is both *intentional* and of such a nature and character that harm inheres in it" does the insured's "actual subjective intent to harm . . . become[] irrelevant" (emphasis added)).

[23] The Court hears Stanley's public policy plea but finds it unpersuasive in this context. The Commonwealth saw fit to prosecute Smith for his conduct in the confrontation, and the Laurel Circuit Court convicted Smith of a felony based on the jury verdict. The policy application to other facts must await other cases; here, Smith committed a felony, and the

## IV.    CONCLUSION

For these reasons, the Court **DECLARES** that ASIC has no duty to defend or indemnify Smith, in his individual or official capacities, regarding each insurance form at issue, as to case no. 6:16-CV-264-REW. Accordingly, the Court **GRANTS** DE #22 and will enter a separate Judgment.

This the 19th day of February, 2019.

**Signed By:**

_**Robert E. Wier**_  RⲔⲰ

**United States District Judge**

---

notion of excluding coverage for adjudicated felonious conduct hardly carries the public policy concerns Stanley earnestly touts.